UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| RHODELLA WRIGHT, | : | Case No. 13-CV-4976 (NRB) |
| Plaintiff, | : | |
| v. | : | **STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1** |
| JEWISH CHILD CARE ASSOCIATION OF NEW YORK, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

  Pursuant to Local Civil Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendant Jewish Child Care Association of New York ("Defendant" or "JCCA"), by and through its undersigned counsel, hereby submits the following Statement of Undisputed Material Facts in support of its motion for summary judgment:

**Background**

  1.  JCCA is a not-for-profit, comprehensive, multicultural agency that serves children and families.  JCCA's programs in New York City, Westchester County and Long Island include: group and family day care, mental health and preventive services, education programs, foster homes, group homes and residential services for children and adolescents, preventive services, independent living skills training, adoption programs, and services to youth on the autism spectrum or with other special needs.  JCCA programs reach more than 16,000 children and family members annually in New York City, Westchester County, and Long Island. (Declaration of Richard Hucke, hereinafter "Hucke Decl.," ¶ 3.)

2. JCCA is an equal opportunity employer committed to maintaining a diverse workforce. (Hucke Decl. ¶ 3.)

3. Plaintiff, Rhodella Wright ("Plaintiff" or "Wright") is a black woman. (Friedfel Decl. Ex. A, ¶¶ 7, 28.)

4. Plaintiff was born on March 19, 1962. (Wright Tr. 7.)[1]

**Plaintiff is Hired by JCCA**

5. Plaintiff began her employment with JCCA in 1995 as a Milieu Counselor working with the children who resided in the JCCA cottages. (Wright Tr. 18-19.)

6. Plaintiff was promoted in 1997 to Senior Milieu Counselor. (Wright Tr. 18.)

7. In 2007, Plaintiff requested a transfer out of the cottages and began working as a shipping clerk. (Wright Tr. 18-19.)

8. In both the milieu counselor and shipping clerk positions, Wright worked at JCCA's Westchester County location in Pleasantville, New York. (Wright Tr. 20.)

9. In December 2010, Wright was informed that her position as a shipping clerk was being retrenched. (Wright Tr. 22-23.)

10. She was offered a position working with the children in the cottages again, but she declined it and, as a result, was laid off. (Wright Tr. 24.)

**Plaintiff's Grievance and Settlement**

11. Pursuant to the collective bargaining agreement ("CBA") between JCCA and Local 215 of the Community and Social Agency Employee Union District Council 1707, A.F.S.C.M.E., A.F.L-C.I.O. (the "Union"), the Union filed a grievance on Wright's behalf

---

[1] Excerpts of the transcript of Plaintiff's deposition, referred to herein as "Wright Tr." can be found at Friedfel Decl. Exhibit B.

claiming that due to Wright's tenure with JCCA, she should be permitted to "bump" into another position.  (Wright Tr. 24-25.)

12. The CBA provides that,

"…employees about to be laid off shall be permitted to bump into job classifications carrying the same rate range if they have had reasonable experience in the job and have the ability to do the work.  An employee who bumps into another job classification shall be required to serve a probationary period in the job into which he bumps; if he is found unsatisfactory in the new job and is discharged during the probationary period, he shall receive severance pay as of the date of the transfer as provided for upon retrenchment or reorganization."

(Luyando Decl. Ex. B, at JCCA 676.)

13. The grievance was settled on or about February 9, 2011.  (Wright Tr. 26; Friedfel Decl. Ex. C.)

14. Pursuant to the settlement, Wright was transferred to a receptionist position in JCCA's Bridges to Health ("B2H") program located in Brooklyn, New York.  (Wright Tr. 26; Friedfel Decl. Ex. C.)

15. The B2H program has a diverse workforce to match the diverse population that it serves.  (Hucke Decl. ¶ 4.)

16. At that time, there were 105 full-time regular employees in the B2H program; 45 of those employees identified as Black or African American, 39 identified as Hispanic or Latino, and the remainder identified as White or Asian or elected not to identify their race.  (Hucke Decl. ¶ 4.)

17. In February 2011, 28 of the B2H employees were over 40 years of age, nine of whom were age 50 or over.  (Hucke Decl. ¶ 4.)

18. Wright was very unhappy to be moved to the Brooklyn location, but she agreed to accept the position.  (Wright Tr. 47-48.)

19. On February 9, 2011 and again on February 18, 2011, Wright was sent a letter confirming the terms of the settlement, including her salary in the new position and a requirement that she serve a three-month probationary period, as provided in the CBA. (Friedfel Decl. Exs. C, D.)

20. On or about February 19, 2011, Wright contacted Norman Taylor, her union representative, and questioned the probation requirement. (Wright Tr. 35.)

21. Mr. Taylor informed her that probation was "standard procedure for JCCA." (Wright Tr. 35.)

22. Wright testified that "[h]e said basically when you go to a new position on (sic) JCCA they put you on probation." (Wright Tr. 35.)

23. Wright testified that she believed that four Caucasians—including a man named "Guy" and a woman named "Christy"— had been transferred but were not required to serve probation. (Wright Tr. 36-37.)

24. Wright does not know anything about the circumstances that led the other employees to transfer. (Wright Tr. 38.)

25. Luyando reviewed JCCA's human resources database and could not identify any employee named Christy. Luyando is aware of an employee named Guy Loving, but he did not bump into another position pursuant to the collective bargaining agreement. He was a non-union, on call employee at the Pleasantville campus, and he applied for and was hired into a regular position in another JCCA location. (Luyando Decl. ¶ 6.)

26. Of the four Caucasians who Wright alleges transferred without serving probation, Wright believes that two of them were under age 40. (Wright Tr. 38.)

**<u>Wright Begins Working as a Receptionist</u>**

27. Wright started in her new receptionist position on February 14, 2011. (Wright Tr. 51-52.)

28. Lawrence Johnson, Wright's direct supervisor once she began her new receptionist position, is also Black. (Wright Tr. 53.)

29. During her initial meeting with Mr. Johnson, Wright informed him that she would try to transfer back to Westchester as soon as possible. (Wright Tr. 53-55.)

30. Shortly thereafter, Wright required time off to care for her mother who was having surgery; Wright was absent from February 22 through 25. (Wright Tr. 65-66, 119; Declaration of Lawrence Johnson, hereinafter "Johnson Decl.," ¶ 6.)

31. During that time, JCCA moved to new office space. (Wright Tr. 66-67.)

32. At the new location, the B2H program was housed with other large programs with one central reception area at the building entrance, "the front desk." (Wright Tr. 64; Hucke Decl. ¶ 5.)

33. Management decided to have Wright and the receptionist from another large program, mental health, cover the front desk in coordinated shifts with additional coverage from other clerical staff as needed. (Hucke Decl. ¶ 5.)

34. In order to ensure adequate front desk coverage, management needed to change Wright's schedule on Mondays from 11 a.m. until 7 p.m. to noon until 8 p.m. (Wright Tr. 76-77; Friedfel Decl. Ex. E.)

35. On or about March 3, 2011, Johnson and Richard Hucke, Johnson's manager and the director of the B2H program, met with Wright and informed her that the change was

5

necessary to ensure adequate coverage for the front desk and provided her with written notice of the change. (Wright Tr. 67-68; Friedfel Decl. Ex. E.)

36. Wright objected to the change in her schedule, indicating that it was not her responsibility to help ensure coverage for the front desk, and refused to sign the memo acknowledging the change. (Wright Tr. 67-69; 74-75.)

37. Shortly thereafter, the other front desk receptionist went on leave. (Wright Tr. 79.)

38. As a result, other clerical employees were asked to cover the front desk during various parts of the day in addition to their ordinary, non-receptionist duties. (Hucke Decl. ¶ 6.)

39. A front desk coverage schedule was issued. (Wright Tr. 80; Friedfel Decl. Ex. F.)

**<u>Wright Refuses to Perform the Requirements of her Job</u>**

40. Since covering the front desk was one of Wright's principal job duties, she was expected to cover the front desk for 4 hours per day, five days per week. Because the other clericals were being asked to add the front desk responsibility to their other ordinary responsibilities, the other four employees were expected to cover the front desk only 3 or 4 days per week for a variety of time periods ranging from one to three hours. (Hucke Decl. ¶ 6.)

41. Wright complained that this was not fair and argued with Stephanie Walton, office manager for the mental health program, claiming that she should not have to cover the front desk for four hours per day. (Wright Tr. 82; Friedfel Decl. Ex. F.)

42. In early April, Wright further complained to Johnson about the requirement that she cover the front desk, stating that she felt that "I'm the only one sharing the responsibilities for the front desk and that's not even my job." (Wright Tr. 83-84.)

43. Wright testified that she believed that she was expected to spend more time working at the front desk than the others because she refused to sign the March memo regarding the change to her schedule. (Wright Tr. 117-18.)

44. In an effort to accommodate Wright, management proposed to her six different front desk schedules, but she rejected them all. (Wright Tr. 103-05; Friedfel Decl. Ex. F.)

45. Wright claims that she was not being accommodated, and she was upset that management did not consult her to ask her which days she wanted to work at the front desk, testifying that management "did their own scheduling and they wanted me just to follow what they did." (Wright Tr. 103-04.)

**Wright's Excessive Absenteeism**

46. Wright was admittedly absent due to her own illness for at least four days in late March 2011 and left early again on April 7, 2011. (Wright Tr. 161, 164; Friedfel Decl. Ex. G.)

47. Johnson sent emails to the clerical staff regarding the days on which Wright was absent. Johnson emailed the clerical staff on March 24, 25, 28, 29 and April 1 concerning Wright's absences. (Johnson Decl. ¶¶ 7-11.)

48. Because Wright's responsibilities had to be fulfilled daily, when Wright was absent, other employees and her supervisor had to cover for her. (Wright Tr. 147-48.)

**Wright is Reassigned to a Different Office**

49. After the move to the new office space, Wright had been permitted to use an unoccupied office with a window. Later, however, that windowed office was needed for someone with a more senior position. (Johnson Decl. ¶ 3.)

50. As a result, on or before April 11, 2011, Plaintiff was reassigned to a different office without a window. (Wright Tr. 127-28; Friedfel Decl. Ex. H; Johnson Decl. ¶ 3.)

51.     Wright complained that the office was too hot and that it was difficult for her to breathe.  Wright testified that she suspected that Luyando and Hucke told Johnson to assign her to a hot room with no window, but her only basis for such a belief was "because no matter what they said to me they couldn't break me.  Wright conceded that she did not know who made the decision.  Office assignments were determined by Johnson and Jaqueline Rodriguez, Program Director of Health Care Integration Services, based upon the needs of the business.  Luyando and Hucke were not involved.  (Wright Tr. 131-32, 144; Johnson Decl. ¶ 3.)

52.     After efforts to regulate the temperature were unsuccessful, Johnson assigned Wright to a different office space that was more comfortable for her.   (Wright Tr. 144-46.)

**Wright's Allegations of Age Discrimination**

53.     Although she did not know who he was at the time, Wright alleges that Ruben Luyando, Senior Human Resources Business Partner, commented to her on as many as four occasions prior to April 15, 2011 that the person that she bumped out of the receptionist position had been younger, that she was an older person for the position, and that the position was meant for a younger person.  (Wright Tr. 113-15.)

54.     Wright further alleges that on one occasion he asked her if she could "keep up." (Wright Tr. 115.)

**Wright is Counseled About the Deficiencies in her Performance**

55.     On or about April 15, 2011, Wright attended a meeting with Luyando, Johnson, Hucke, Rodriguez and a Union representative.  (Wright Tr. 92.)

56.     During the meeting, Wright was counseled about the deficiencies in her performance, including her failure to cooperate with respect to scheduling and her absenteeism. (Wright Tr. 98-102; Friedfel Decl. Ex. I.)

57. Wright objected to the claim that her attendance was problematic, indicating that she had needed to be out because her mother had surgery and because she herself was ill. (Wright Tr. 99-100.)

58. In response to the flexibility criticism, Wright continued to complain about her job responsibilities, including the number of hours that she was expected to cover the front desk and her clerical duties for B2H. (Wright Tr. 98, 102-105.)

59. Wright testified that she raised the following at the meeting,

> "[Y]eah, he changed my schedule, and he's saying that we have to go back upstairs and complete our other clerical duties in our other department. … I said well, you kept me downstairs longer than anybody. I said how you expect for me to go upstairs? And I'm exhausted now, you know, I've did everything I did and now you want me to go back upstairs? Which I went back to my department and did what I had to do. I was tired, you know, I was overwhelm." (sic)

(Wright Tr. 117-18.)

60. Wright refused to sign the record of verbal counseling document. (Wright Tr. 120.)

61. After the meeting was over Wright yelled at Johnson, her supervisor, telling him that he should have given her advance notice of the meeting and should not just "pop a meeting" on her. (Wright Tr. 123-24.)

62. Wright later apologized for yelling. (Wright Tr. 122-23.)

63. Wright admits that she was overwhelmed by the front desk work, that "it was too much for one person to handle", and that she "couldn't keep up fast enough." (Wright Tr. 95.)

64. She expressed her frustration to Johnson, telling him "I don't know what I'm doing. I mean, I'm totally lost." (Wright Tr. 95-96.)

65. On April 20, 2011, Ms. Wright sent an email to Michael Spindler, JCCA's Chief Operations Officer, and others complaining that the verbal counseling that she received was harassing. (Wright Tr. 135; Friedfel Decl. Ex. J.)

66. At no point, however, did she claim that she was being harassed because of her race or her age, only because she had refused to sign the memo regarding her schedule change. (Friedfel Decl. Ex. J.)

67. In response to this email, Ruben Luyando advised Ms. Wright that the verbal counseling was not grievable pursuant to the CBA and that the written record of verbal counseling and her email in response would be placed in her personnel file. (Wright Tr. 176-77; Friedfel Decl. Ex. K.)

**Wright is Terminated Prior to the Expiration of her Probationary Period**

68. The probationary period for Wright's position was scheduled to end on May 14, 2011. (Friedfel Decl. Ex. L.)

69. Johnson and Hucke evaluated Wright's performance during the probationary period and determined that she was not a good fit for the receptionist position because her attendance was poor, she was inflexible with respect to scheduling, and she was resistant to performing one of her most significant job responsibilities, covering the front desk. (Hucke Decl. ¶ 8; Johnson Decl. ¶ 13.)

70. Accordingly, Johnson and Hucke decided to terminate Wright's employment before the expiration of the probationary period and made arrangements to communicate that decision to Wright. (Hucke Decl. ¶ 8; Johnson Decl. ¶ 13.)

71. Luyando was not involved in making the decision to terminate Wright's employment; he was asked to assist in communicating the decision to Wright after it had been finalized. (Declaration of Ruben Luyando, hereinafter "Luyando Decl.," ¶ 4.)

72. On May 10, 2011, Wright attended a meeting with Ruben Luyando, Lawrence Johnson, Richard Hucke, and two union representatives. (Wright Tr. 166-67; Luyando Decl. ¶ 3.)

73. The decision to terminate Wright's employment was finalized prior to the May 10, 2011 meeting. (Hucke Decl. ¶ 8; Johnson Decl. ¶ 13; Luyando Decl. ¶ 4.)

74. At the meeting, Luyando informed Wright that her employment was being terminated because she had not passed probation. (Wright Tr. 168.)

75. Wright claims that when she questioned the decision, Richard Hucke and Ruben Luyando told her that she was not suitable and "doesn't fit here" and that they laughed. (Wright Tr. 169-73.)

76. Plaintiff testified that these were the only two comments purportedly related to her race and that no other JCCA employee said or did anything to make her believe that she was being discriminated against based upon her race. (Wright Tr. 177-79.)

77. On May 18, 2011, Luyando prepared a memorandum documenting what happened at the meeting. The memorandum indicated that when Wright asked why she had not passed probation, "Hucke responded that she was not a good fit for the program and cited her lack of flexibility as an example." (Luyando Decl. Ex. A.)

78. Reflecting on her treatment by Johnson, Wright testified that he was "pretty fair." (Wright Tr. 124.)

79. Wright filed the Complaint in this action on July 17, 2013. (Friedfel Decl. Ex. A.)

Dated: August 15, 2014
New York, New York

        PROSKAUER ROSE LLP

        By: /s/ Susan D. Friedfel
            Jerold D. Jacobson
            Susan D. Friedfel
            Eleven Times Square
            New York, New York 10036
            Tel: 212-969-3384
            Fax: 212-969-2900
            *Attorneys for Defendant*