UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
RHODELLA WRIGHT,

                Plaintiff,

      - against -

JEWISH CHILD CARE ASSOCIATION
OF NEW YORK,

             Defendant.
----------------------------------------X

**MEMORANDUM AND ORDER**

13 Civ. 4976 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     Plaintiff Rhodella Wright ("Wright") commenced this action against her former employer, Jewish Child Care Association of New York ("JCCA"), alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA"). Presently before the Court is JCCA's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth herein, this motion is granted.

## BACKGROUND[1]

---

[1] The facts recited here are drawn from the following sources: (1) the complaint filed July 17, 2013 ("Cmplt."); (2) Defendant's Rule 56.1 Statement ("56.1"); (2) the Declaration of Susan D. Friedfel in Support of Defendant's Motion for Summary Judgment ("Friedfel Decl."), and the exhibits attached thereto, including the transcript of Wright's deposition ("Tr."); (3) the Declaration of Ruben Luyando in Support of Defendant's Motion for Summary Judgment ("Luyando Decl."), and the exhibits attached thereto; (4) the Declaration of Lawrence Johnson in Support of Defendant's Motion for Summary Judgment ("Johnson Decl."), and the exhibits attached thereto; (5) the Declaration of Richard Hucke in

## I.    Factual Background

Wright, a black woman over the age of forty, was first employed by JCCA in 1995 as a "Milieu Counselor," working with children in the JCCA cottages in Pleasantville, New York.  Cmplt. ¶¶ 8-9; 56.1 ¶¶ 3-5.  In 2007, Wright applied for and received a transfer to work as a "Shipping and Inventory Clerk," also at JCCA's Pleasantville location.  Cmplt. ¶ 9.  However, in December 2010, Wright was informed that her clerk position was being retrenched and was asked to return to working in the cottages, an offer she rejected.  As a result, she was laid off.  56.1 ¶¶ 9-10; Tr. 22-24.

Wright's union filed a grievance on Wright's behalf pursuant to its collective bargaining agreement with JCCA, claiming that, given her tenure at JCCA, Wright should be permitted to "bump" into another position.[2]  56.1 ¶ 11; Tr. 24-25.  The grievance was settled on February 9, 2011, with an agreement that Wright would be transferred to a receptionist position in JCCA's Bridges to

---

Support of Defendant's Motion for Summary Judgment ("Hucke Decl."), and the exhibits attached thereto; and (6) Plaintiff's Affirmation in Opposition to Defendant's Motion ("Pl. Opp."), and the documents attached thereto.

[2] The collective bargaining agreement provides that "employees about to be laid off shall be permitted to bump into job classifications carrying the same rate range if they have had reasonable experience in the job and have the ability to do the work. An employee who bumps into another job classification shall be required to serve a probationary period in the job into which he bumps; if he is found unsatisfactory in the new job and is discharged during the probationary period, he shall receive severance pay as of the date of the transfer as provided for upon retrenchment or reorganization."  56.1 ¶ 12; Luyando Decl., Ex. B.

Health ("B2H") program in Brooklyn.  56.1 ¶¶ 13-14; Tr. 26.  At the time, B2H employed 105 full-time employees, 45 of whom identified as Black or African American and 28 of whom were over forty years old.[3]  56.1 ¶¶ 16-17; Hucke Decl., ¶ 4.  As a receptionist at B2H, Wright would be expected to, among other things, "[a]nswer telephones," "[g]reet[] visitors to the program site," perform "[c]lerical tasks as assigned," and "[p]rovide front desk coverage."  Pl. Opp., Ex. K.  Wright was unhappy that she would now have to travel to Brooklyn, but agreed to take the position.  56.1 ¶ 18; Tr. 47-48.

On February 9, 2011, Wright was sent a letter confirming the terms of the settlement and her new employment, including her new salary, working hours, and that she would undergo a three-month probationary period.  56.1 ¶ 19; Friedfel Decl., Ex. C; Pl. Opp., Ex. I.  Wright contacted her union representative to dispute the probation requirement, but was told that probation was standard procedure, such that "when you go to a new position [at] JCCA they put you on probation."  56.1 ¶¶ 20-22; Tr. 35.  Nevertheless, Wright continued to question the circumstances of her probation, testifying that she believed that four Caucasian employees, two of whom she believed were under forty years old, had likewise been transferred but had not been asked to serve a probationary period.

---

[3] In addition, 39 employees identified as Hispanic or Latino, and 9 were listed as at least 50 years old.  56.1 ¶¶ 16-17; Hucke Decl., ¶ 4.

56.1 ¶¶ 23, 26; Tr. 36-38.  Wright indicated that these employees included a woman named Christy and a man named Guy; however, she testified that she did not know their last names or any information regarding the circumstances of their transfers.  56.1 ¶¶ 23-24; Tr. 36-38.  In his subsequent review of the JCCA personnel files, Ruben Luyando, JCCA's Senior Human Resources Business Partner, identified no employee named Christy and one non-union employee named Guy who had not transferred pursuant to a collective bargaining agreement "bump," as Wright had done, but rather had applied to and was hired for a regular position in another JCCA location.  56.1 ¶ 25; Luyando Decl., ¶ 6.

On February 18, 2011, Wright began her position as receptionist at B2H.  56.1 ¶ 27; Tr. 51-52.  Shortly thereafter, Wright required time off to care for her mother and was absent from February 22-25. 56.1 ¶ 30; Tr. 65-66.

During that time, JCCA moved to a new office, at which the B2H program was housed alongside other JCCA programs with one central reception area at the building entrance ("the front desk"). 56.1 ¶¶ 31-32; Tr. 64.  Because B2H and the mental health program formed the two largest programs in the new space, the directors of B2H and the mental health program agreed that their programs' receptionists would provide the bulk of the front desk coverage. Hucke Decl., ¶ 5.  To ensure adequate front desk coverage between the two receptionists, Wright's work schedule was pushed back one

4

hour, from 11-7 to 12-8.  56.1 ¶ 34; Pl. Opp., Ex. H.  Richard
Hucke, director of B2H, and Lawrence Johnson, Wright's direct
supervisor who is also black, met with Wright to explain the change
and provide her with written notice of the new schedule.  56.1 ¶
35; Tr. 67-68.  Wright objected to the change, indicating that her
responsibility was only to work for B2H and not to help with the
front desk, and she refused to sign the memo acknowledging the
schedule change. 56.1 ¶ 36; Tr. 67-69, 74-75.

Shortly after the relocation, in early March 2011, the
receptionist from the mental health program went on maternity leave
and other clerical employees were asked to help cover the front
desk in addition to their non-receptionist duties.  56.1 ¶¶ 37-
38; Tr. 79; Hucke Decl., ¶ 6.  Management consequently issued a
new front desk schedule, in which Wright was asked to staff the
desk for four hours a day and the covering clerical employees were
asked to staff the desk for one to three hours.  56.1 ¶ 39; Pl.
Opp., Ex. F.; Hucke Decl., ¶ 6.  Wright was dissatisfied with this
schedule and complained to Johnson and to the mental health
program's office manager that she had been given undue
responsibility for the front desk.  56.1 ¶¶ 41-42; Tr. 82-84.  In
particular, Wright believes that she was unfairly asked to
undertake more front desk coverage than others because of her
earlier refusal to sign the memo regarding her schedule change.
56.1 ¶ 43; Tr. 117-18.  Management changed the new schedule six

times in an attempt to accommodate Wright, but she rejected each change as unfair and criticized management for failing to consult with her before setting a new schedule.  56.1 ¶¶ 44-45; Tr. 103-05.

In late March, Wright was again absent for at least four days due to illness, and she left work early on April 7, 2011.  56.1 ¶¶ 46-47; Tr. 161, 164.  Because Wright's responsibilities, including front desk coverage, had to be fulfilled daily, other employees were asked to cover for Wright during her absence.  56.1 ¶ 48; Tr. 147-48.

A few weeks later, in early April, Wright was told that her office would be reassigned to another employee with a more senior position, and she was relocated to an internal office without a window.  56.1 ¶¶ 49-50; Tr. 127-128; Johnson Decl., ¶ 3.  Wright complained that her new office was too hot, making it difficult for her to breathe, and she expressed her belief that she had been reassigned as further retaliation for her scheduling protests.  56.1 ¶ 51; Tr. 131-32, 144.  After efforts to improve the room's temperature were unsuccessful, Wright was reassigned to another office space.  56.1 ¶ 52; Tr. 144-46.

Also during this time period, Wright claims that, although she did not know who he was at the time, Senior Human Resources Business Partner Ruben Luyando made several derogatory comments to Wright regarding her age.  In particular, Wright alleges that

Luyando commented to her on as many as four occasions that the person she had "bumped" out of the receptionist position had been younger and that her position was meant for a younger person.  56.1 ¶ 53; Tr. 113-15.  She further alleges that Luyando once asked her if she could "keep up."  56.1 ¶ 54; Tr. 115.

On April 15, 2011, Wright attended a meeting with Johnson, Hucke, Luyando, and a representative from Wright's union at which Wright was counseled about deficiencies in her performance, including her absences and her failure to cooperate with scheduling.  56.1 ¶¶ 55-56; Tr. 92, 98-102.  Wright disputed management's calculation of her absences and argued that the time she had taken off for illness and for her caretaking obligations was justified and therefore not problematic.  56.1 ¶ 57; Tr. 99-100.  With regard to the scheduling concerns, Wright reiterated her belief that she was expected to work an unfair number of hours at the front desk and stated that the excessive amount of front desk coverage left her "exhausted" and "overwhelm[ed]" in the face of her additional B2H duties.  56.1 ¶¶ 58-59; Tr. 98, 102-05, 117-18.  At the close of the meeting, Wright refused to sign the record of verbal counseling document and "yelled at" Johnson for failing to give her advance notice of the meeting, though she later apologized to Johnson for her overreaction.  56.1 ¶¶ 60-62; Tr. 117-124.

On April 20, 2011, Wright sent an email to JCCA's Chief Operations Officer and others expressing her belief that the schedule changes and verbal counseling she had received constituted harassment. 56.1 ¶ 65; Pl. Opp., Ex. D. She did not, however, suggest that she was being harassed on account of either her race or her age; rather, she felt that management's conduct "stemm[ed] from [her] refus[al] to sign a letter [noting the] schedule change." Pl. Opp., Ex. D. Luyando informed Wright that the verbal counseling session was not grievable under her union's collective bargaining agreement and that both the written record of verbal counseling and her email would be placed in her personnel file. Id.; 56.1 ¶ 67.

Before the close of Wright's probationary period on May 14, 2011, Johnson and Hucke evaluated Wright's performance and decided to terminate Wright's employment, citing her poor attendance, lack of flexibility with respect to scheduling, and resistance to covering the front desk, which had become a significant responsibility for the position in B2H's new location. 56.1 ¶ 69; Hucke Decl., ¶8; Johnson Decl., ¶ 13. On May 10, 2011, Wright attended a meeting with Johnson, Hucke, Luyando, and union representatives, at which Wright was informed that she had not passed probation and that her employment would consequently be terminated. 56.1 ¶ 72, 74; Tr. 166-68. Wright asked for the basis of the decision and was told that she was "not suitable" and

"d[id]n't fit," at which point Luyando and Hucke allegedly laughed. 56.1 ¶ 75; Tr. 169-73.  Wright believes that these comments were made with regard to her race, though she testified that no other employee said or did anything she interpreted as racially discriminatory.  56.1 ¶ 76; Tr. 177-79.

## II.  Procedural Background

Wright filed a complaint against JCCA on July 17, 2013, which defendants answered on October 11, 2013.  After a period of discovery and an unsuccessful attempt at mediation, Wright's counsel moved to withdraw on March 14, 2014.  Judge Baer granted the withdrawal as having been made without objection; however, after Wright wrote to the court expressing her dissatisfaction with the withdrawal, Judge Baer reversed the decision.

On July 9, 2014, Wright's counsel again moved for leave to withdraw.  While this motion was pending, on July 10, 2014, the case was reassigned to this Court, and on July 17, 2014, we granted counsel's motion to withdraw.  Wright then applied for an appointment of pro bono counsel, which we denied on August 6, 2014, on the basis that "plaintiff has [not] demonstrated a sufficient likelihood of success on the merits that would support the appointment of counsel."  On August 15, 2014, JCCA moved for summary judgment, and the motion was fully briefed on September 22, 2014.

9

## DISCUSSION

### I.   **Legal Standard**

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted).  "In assessing the record to determine whether there is [such] a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'"  F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Id. (citing

Anderson, 477 U.S. at 249).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).

The Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'"  Gorzynski, 596 F.3d at 101 (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)).  Nevertheless, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994) (citation omitted).  Indeed, it is well established that "summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); see also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985) ("Indeed, the salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to commercial or other areas of litigation.").

Because Wright is now proceeding pro se, we interpret her submissions in opposition to summary judgment "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and emphasis omitted). Nonetheless, she "must still be held to the normal requirements of summary judgment, and 'bald assertion[s],' unsupported by evidence, will not overcome a motion for summary judgment." Sesay-Harrell v. New York City Dep't of Homeless Servs., 12 Civ. 925 (KPF), 2013 WL 6244158, at *9 (S.D.N.Y. Dec. 2, 2013) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)).

## II.  **Analysis**

Wright claims that JCCA violated Title VII and the ADEA by discriminating against her on the basis of her race and age.[4] Cmplt. ¶¶ 27-28.  Claims of both race and age discrimination under Title VII and the ADEA are analyzed in accordance with the three-step evidentiary burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Pena v. Brattleboro Retreat, 702 F.2d 322, 323 (2d Cir. 1983) ("The

---

[4] To the extent that plaintiff also seeks to state a claim under 42 U.S.C. § 1983, see Cmplt. ¶ 4, this claim fails because Wright has made no allegations suggesting the involvement of state action. See, e.g., Tancredi v. Metro. Life Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.").

standards relating to burden and order of proof in Title VII cases apply as well to cases arising under the ADEA."); Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010) (applying McDonnell to race discrimination); Mikinberg v. Bemis Co., 555 F. App'x 34, 35 (2d Cir. 2014) (applying McDonnell to age discrimination). Under this framework, a plaintiff must first establish a prima facie case by showing that: (1) she was within a protected class or age group, respectively; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See Ruiz, 609 F.3d at 492; Gorzynski, 596 F.3d at 107. If the plaintiff makes her prima facie case, the burden of production shifts to "the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the employer meets that burden, the plaintiff must then raise a triable issue of fact as to whether the employer's legitimate, nondiscriminatory reason was merely pretextual. Ruiz, 609 F.3d at 492; Gorzynski, 596 F.3d at 106.

In addition, in the age discrimination context, the plaintiff "must prove not only that the proffered nondiscriminatory reason was pretextual but also that the discrimination was the real reason." McDonald v. Unites States Postal Serv. Agency, 547 F. App'x 23, 25 (2d Cir. 2013) (internal quotation marks omitted).

In other words, she must prove "that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." Gorzynski, 596 F.3d at 106 (internal quotation mark omitted).

## A.   **Wright Fails to Make a _Prima Facie_ Case**

"Although the burden of proof in establishing a prima facie case is 'minimal,' it is not non-existent." Dumay v. City of New York, 09 Civ. 6866 (NRB), 2011 WL 4901311, at *7 (S.D.N.Y. Oct. 14, 2011) (quoting Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001)).  Here, Wright has shown has that she is within protected class and age groups and that she was subject to an adverse employment action, and we assume for the purposes of this opinion only that she was qualified to serve as receptionist. Nevertheless, Wright fails to make a prima facie showing of either race or age discrimination because she cannot establish that her termination occurred under circumstances giving rise to an inference of race- or age-based animus.

### 1. Race Discrimination

The sole basis for Wright's contention that her termination was the result of racial animus is the explanation given to Wright by Hucke and Luyando as to why she had been terminated: namely, Hucke and Luyando allegedly informed Wright that she had not passed probation because she was not "suitable" and did not "fit" the program, phrases Wright believes to have been racially motivated.

Wright has offered no other circumstantial evidence of racism in the workplace, and when asked whether "anyone at JCCA sa[id] or d[id] anything else [beyond these two remarks] that [Wright] believe[d] indicate[d] discrimination based on race," Wright answered, "No[, j]ust those two."[5]  Tr. 179.

These two racially neutral remarks alone are inadequate to support an inference of discrimination.  See, e.g., Whethers v. Nassau Health Care Corp., 956 F. Supp. 2d 364, 380 (E.D.N.Y. 2013) aff'd, 578 F. App'x 34 (2d Cir. 2014) (finding no indication of racial animus in defendant's statement that plaintiff was "only suitable for copy charts" where "there is no evidence from which to infer that this statement was a critique 'in ethnically degrading terms'"); Taylor v. Polygram Records, 94 Civ. 7689 (CSH), 1999 WL 124456, at *17 (S.D.N.Y. Mar. 8, 1999) ("Given the ambiguity of the statement [that defendant didn't want to work with plaintiff] and the fact that it could have arisen from any number of conceivable bases, it is sheer speculation to infer that the comment, if made, was somehow linked to [plaintiff]'s race. The comment is only minimally probative of [defendant]'s bias, if

---

[5] To the extent that Wright's complaint also suggests a racially discriminatory application of the probation requirement, see Cmplt. ¶ 11 ("Without reason, plaintiff was placed on probation . . . ."), such allegations are belied by Wright's admission that only "those two [remarks]" were considered by her to be discriminatory treatment, as well as by her inability to adduce any evidence showing that the probation requirement, clearly stated in the collective bargaining agreement, was either not applied to any Caucasian employees or misapplied on the basis of race.  See Tr. 35; Luyando Decl., Ex. B; id. ¶ 6.

at all, and will not permit an inference of discrimination with respect to [plaintiff]'s termination.").

Moreover, the racial makeup of B2H and of Wright's supervisors further undercuts any possible inference of discrimination. Courts have found that a showing that a workplace contains "substantial racial diversity among the employees comparable to Plaintiff [can] negate any inference of discrimination that otherwise might have been created." Liburd v. Bronx Lebanon Hosp. Ctr., 07 Civ. 11316 (HB), 2009 WL 900739, at *5 (S.D.N.Y. Apr. 3, 2009) aff'd, 372 F. App'x 137 (2d Cir. 2010) and aff'd, 372 F. App'x 137 (2d Cir. 2010) (finding that while remarks about plaintiff's "black ass" could be actionable taken alone, they did not support an inference of discrimination in the context of a workforce in which thirty-three to forty percent of employees were also black); see also Joseph v. Thompson, A95CV4898DGTMDG, 2005 WL 3626778, at *10 (E.D.N.Y. Mar. 23, 2005) aff'd sub nom. Joseph v. Leavitt, 465 F.3d 87 (2d Cir. 2006) (finding "little merit" to discriminatory intent claim by African-American plaintiff "since the evidence shows that minorities made up between thirty-eight and fifty percent of the total number of employees at plaintiff's level during the years for which information was provided, and African-Americans specifically making up twenty-five to thirty percent"). Here, employees of Wright's race made up more than forty percent of her department, militating against an inference

of discrimination.  In addition, "[c]ourts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the effected employee." Baguer v. Spanish Broad. Sys., Inc., 04 Civ. 8393 (RJS), 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010) aff'd sub nom. Baguer v. Spanish Broad. Sys., Inc., 423 F. App'x 102 (2d Cir. 2011).  Wright's discrimination claim is yet further undermined by the fact that her termination was the decision of Johnson as well as Hucke, who Wright acknowledges is African American and who she feels "was pretty fair with" her.  Tr. 53, 124.

Accordingly, Wright provides no evidence from which to infer that her termination was the result of racial animus and thus fails to establish a prima facie case of racial discrimination under Title VII.

**2. Age Discrimination**

Wright's age discrimination claim is based on several comments made to Wright by Luyando in the lead-up to the April 15, 2011 verbal counseling meeting, over a month before her termination.[6]  Specifically, Wright claims that Luyando informed her that the person she had "bumped" out of the receptionist

---

[6] Again, to the extent that Wright's complaint also suggests age discrimination in the requirement that she undertake a probationary period, these allegations are inadequate because Wright has produced no evidence showing that the probation requirement, clearly stated in the collective bargaining agreement, was either not applied to younger employees or misapplied on the basis of age. See Tr. 35; Luyando Decl., Ex. B; id. ¶ 6.

position had been a younger person, asserted that her position should have been for a younger person, and asked her whether she could "keep up."  Tr. 113-15.

Even if evincing an age bias, these remarks do not suffice to establish an actionable inference of discrimination.  Notably, Luyando, a member of the Human Resources department, had no part in the decision to terminate Wright, a determination made instead by her supervisors, Johnson and Hucke.  Where, as here, "isolated derogatory remark[s]" are made by individuals "who played no role in [the plaintiff's] termination," courts "have long held that stray comments of this variety do not create an inference of discrimination." Dixon v. Int'l Fed'n of Accountants, 416 F. App'x 107, 110 (2d Cir. 2011).  See also Cai v. Wyeth Pharm., Inc., 09 Civ. 5333 (GBD), 2012 WL 933668, at *7 (S.D.N.Y. Mar. 19, 2012) ("[I]t has been settled that stray remarks by a non-decision maker are insufficient to establish a prima facie case of age discrimination."); Holowecki v. Fed. Exp. Corp., 382 F. App'x 42, 45 (2d Cir. 2010) (finding no evidence of discrimination where the comments "on which plaintiffs seek to rely are either 'stray remarks' or the remarks of non-decisionmakers") (citing Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998)).  Because Wright has offered no evidence that the people responsible for her termination--Johnson and Hucke--said or did anything suggesting a discriminatory animus toward older employees, her allegations

regarding Luyando's comments are insufficient to support a claim of age discrimination.

Furthermore, as with Wright's claim of racial discrimination, an inference of discrimination is further belied by the makeup of her department, in which over one quarter of employees were, like Wright, over forty years old, and at least nine employees were older than Wright at the time of her termination. See, e.g., Carr v. Westlb Admin., Inc., 171 F. Supp. 2d 302, 308 (S.D.N.Y. 2001) ("[P]laintiff's theory is belied by defendant's uncontroverted evidence that almost half of plaintiff's former coworkers are over forty years of age . . . and that plaintiff was younger than at least two other employees in his department (and only one year older than a third)."); Stouter v. Smithtown Cent. Sch. Dist., 687 F. Supp. 2d 224, 235 (E.D.N.Y. 2010) (noting that plaintiff's admission that other employees as old, and older, than she remained employed "weighs against a finding of discrimination"). As such, Wright fails to establish an inference of age bias and thus to establish a prima facie case of age discrimination.

**B.   Wright Fails Under McDonnell Steps Two and Three**

Even assuming Wright could make out a prima facie case of discrimination, Wright would nevertheless fail to prove race or age discrimination under the latter steps of the McDonnell framework.

At step two of the McDonnell analysis, JCCA must provide a legitimate, nondiscriminatory reason for terminating Wright's employment. JCCA's burden here is merely "one of production, not persuasion," Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000), and "[t]he court is not to pass judgment on the soundness or credibility of the reasons offered by defendants, so long as the reasons given are 'clear and specific,'" Schwartz v. York College, 06 Civ. 6754 (RRM)(LB), 2011 WL 3667740 (E.D.N.Y. Aug. 22, 2011) (quoting Mandell v. Cnty. of Suffolk, 316 F.3d 368, 381 (2d Cir. 2003)).  Here, the evidence--both testimonial and documentary--is consistent with JCCA's proffered explanation: that Wright was terminated due to her repeated absences during her short time at B2H, her inflexibility regarding scheduling, and her professed unwillingness and dissatisfaction at having to staff the front desk.

Accordingly, the evidentiary burden shifts back to Wright to demonstrate that these reasons are pretextual, a task for which plaintiff must offer "hard evidence, not conclusory supposition." Schanfield v. Sojitz Corp. of America, 663 F. Supp. 2d 305, 329 (S.D.N.Y. 2009).  For the same reasons that Wright's evidence is inadequate to support an inference of discrimination, it is inadequate to support a finding of pretext sufficient to overcome JCCA's stated justification: namely, the two remarks made at Wright's termination alone provide far too meager evidence of race-

based thinking, and Luyando's comments prove no age bias in Wright's termination because Luyando was not involved in the decision to terminate Wright's employment.    Thus, Wright's discrimination claims must be dismissed.

## C.    Untimely Harassment and Retaliation Claims

Finally, Wright appears to raise for the first time in her opposition to JCCA's motion claims that she was harassed and retaliated against by JCCA employees. See Pl. Opp. at 1 ("My claim is that I was being a harassed by the staff of JCCA B2H program . . . ."); id. ("Because he did not like my respond, that went he started retaliation against me . . . ."); id. at 3 ("I was being retaliate against, because I file and harassment and threaten charge against Ruben Lylando and Richard Huck.").

"It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." Brandon v. City of New York, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010); see also Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701 (2d Cir. 2010).    While this tenet is generally applied to parties represented by counsel, as Wright was at the filing of her complaint through the close of discovery, even Wright's current status as a pro se litigant does not allow her to assert new claims at this late stage.    See Lunts v. Rochester City Sch. Dist., 515 F. App'x 11, 13 (2d Cir.) cert. denied, 134 S. Ct. 429, 187 L. Ed. 2d 282 (2013) (affirming district court's decision not to address

claims by pro se litigant not raised in the complaint); Oyewo v. Lahood, 515 F. App'x 10, 11 (2d Cir. 2013) (holding that a "[p]ro se plaintiff] has abandoned her alternative work schedule claim by raising it for the first time in opposition to [defendant's] motion for summary judgment"); Avillan v. Donahoe, 483 F. App'x 637, 639 (2d Cir. 2012) ("The district court did not err in disregarding allegations [pro se plaintiff] raised for the first time in response to [defendant]'s summary judgment motion."). Accordingly, we do not address these claims.

## CONCLUSION

For the foregoing reasons, JCCA's motion for summary judgment is granted in full.    This Memorandum and Order resolves Docket No. 40, and the Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:    New York, New York
          December 22, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

**Plaintiff**

Rhodella Wright
1199 Fulton Avenue, #2C
Bronx, NY 10456

**Attorneys for Defendant**

Susan D. Friedfel, Esq.
Jerold D. Jacobson, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036